DAVIS *v.* J. W. ROGERS LUMBER Co. *et al.*

(Division B. Jan. 10, 1938.)

[178 So. 75. No. 32970.]

H. B. Greaves, of Canton, for appellant.

Ray & Spivey, of Canton, for appellees.

Argued orally by **H B. Greaves**, for appellant.

**Ethridge, P. J.**, delivered the opinion of the court.

John J. Davis, doing business as Hight Lumber Company, filed suit against J. W. Rogers Lumber Company, a corporation, and J. H. Melvin and Tip Ray, trustee, alleging that J. H. Melvin, a resident of Madison county, desired to erect several houses on certain lands in the city of Canton, describing the lands, which had been conveyed to him by O. F. Mansell; that said J. H. Melvin, owner of the above-mentioned lands, wishing to build several houses on the property, contracted with the J. W. Rogers Lumber Company to build these houses, executing a deed of trust to Tip Ray, trustee, for the use of the J. W. Rogers Lumber Company, covering said property, which deed of trust was duly recorded. It was alleged that while the houses were in process of construction, Henry Melvin, with the consent of J. W. Rogers, manager of J. W. Rogers Lumber Company, purchased from plaintiff certain bills of lumber in the total amount of $267.33, as shown by an itemized account attached to the declaration, which lumber, as alleged, was used in the construction of the houses on the lot, with the full knowledge of the J. W. Rogers Lumber Company; such lumber being necessary for use in building the houses. It was then alleged that the J. W. Rogers Lumber Company was preparing to foreclose the deed of trust covering the land, having advertised the property for sale at public outcry; and that the plaintiff, the Hight Lumber Company, had a materialman's lien on the said houses and lot for the value of the lum-

ber used in the construction of the houses with the knowledge and consent of the Rogers Lumber Company, the lumber having been furnished within six months, and asked for a judgment condemning the property to be sold. The itemized account attached to the declaration was duly sworn to, and on trial was admitted to be correct, and due and owing.

J. H. Melvin made no defense to the suit, but the J. W. Rogers Lumber Company filed an answer to the petition or declaration, in effect setting up therein that J. H. Melvin purchased a certain lot, and erected thereon three negro tenant houses, applying to the lumber company to finance the purchase of the lot and the erection of the three buildings; it admitted the execution of the trust deed covering said property, but denied that it was with the consent of J. W. Rogers, or any other agent or employee of the J. W. Rogers Lumber Company; that Melvin purchased lumber from the plaintiff, as set out in the said petition; and then alleges the truth to be that J. H. Melvin approached J. W. Rogers, president and general manager of the J. W. Rogers Lumber Company, and apprised him of the former's desire to purchase the lot described in the petition, and to erect thereon three houses; the J. W. Rogers Lumber Company to pay for the lot, and for the labor in constructing the houses, and to furnish a large part of the material therefor. The answer avers that Melvin was then operating a sawmill, and agreed to furnish from his own operation a part of the material to be used in the construction of the houses; that thereafter Melvin advised respondent that instead of furnishing the material from his own operation, he proposed to exchange with plaintiff logs and rough lumber for the material to be furnished by Melvin; and thereupon J. W. Rogers, manager of the J. W. Rogers Lumber Company, called C. W. Wright, agent and employee of the plaintiff, and asked for a confirmation of this statement, which Wright gave; and on behalf of plaintiff advised respondent that all of said ma-

terial would be furnished Melvin in exchange for logs and rough lumber, and that plaintiff would not claim, nor attempt to claim, any right or lien against the property described in the petition for the payment of the purchase price for said material. Relying upon this assurance, respondent furnished the purchase price for said land, for the labor necessary for construction of the houses, and the balance of the material to be used therein, all in the total sum of $1,324.77. And that in addition to receiving the aforesaid assurances from plaintiff, respondent advised him through his agent, Wright, that he would not, under any conditions, relinquish or waive the lien under the deed of trust aforesaid, and would not recognize any right or claim of plaintiff against said property; to all of which plaintiff, through its agent, Wright, agreed. Wherefore, the respondent said that plaintiff was estopped to assert any right, title, or interest in and against said property, and that the plaintiff had both actual and constructive notice of the rights of respondent under its deed of trust.

J. W. Rogers was introduced as the first witness, and testified that he never saw the material, except what Melvin himself furnished, some rough material that he got from the Hight Lumber Company; that he knew the Hight Lumber Company was furnishing this lumber, and that it was used in the construction of the houses; at least, he knew that Mr. Wright and Mr. Melvin told him they were furnishing the material. He further testified that Mr. Melvin came to his office with the request that material be furnished to build three houses on small lots; that he told witness that he had enough lumber "to do a lot of things," and wanted a price on the material to finish the houses; brick, sand, cement, and other materials, including doors, etc., the estimate showing that the houses were to cost $277.90 per unit, that is, per house, to the best of witness' recollection. Witness asked where he was going to build, and Mr. Melvin designated the lot, and incidentally asked for

an advance of $100 to use in paying for the lot, which witness agreed to let him have, saying, "it would be all right under certain conditions." Subsequently, Mr. Ray called witness up, and closed the trade for the lot; the witness paying $100 for it for the benefit of Mr. Melvin, and receiving the deed of trust for $1,155.69, which represented three units at $385.23 each; $276.90 was the material bill, as shown by the original estimate, and $75 for carpenter and brick layer per unit; and the amount advanced for the purchase of the lot, $100. The total lumber bill came to $1,324.77, for the reason that the contractor did not finish the building, and Mr. Melvin came back to witness, asking for more money to complete the work.

Rogers testified that the second time Mr. Melvin came to the office that witness called his attention to the fact that he did not have lumber enough to build three houses, to which he replied, "Of course not, I know that. I am furnishing my own rough lumber. This does not have any bearing on the framing and rough material that I am going to furnish myself." This witness remarked, "That was all right. That was his own business. He was to do it." This witness, Mr. Rogers, further testified that he either sent word to Mr. Melvin, or wrote him, and the latter came in and told witness that he had some trouble, and would be unable to bring the rough lumber and timber in from the woods, and would have to buy it from Wright. Witness then asked particularly whether he had "gone into details with Mr. Wright, and told him I had taken a deed of trust on the property, and he said that he had, that Mr. Wright was to get rough lumber and timber, that he agreed to trade Wright timber for the lumber." Witness states that he called Mr. Wright over the telephone, and told him what Melvin said; that he could not get timber from the woods, and had traded Mr. Wright rough lumber or timber for dressed timber to finish the house. So far as witness knew, Mr. Wright agreed to this. Continuing, witness

said: "And I asked him the plain question if he expected to look to this property for his payment, and he said no. I said, 'The reason I am asking you that, I have a mortgage on that property, and I think it is only fair to tell you that,' and I hung up the 'phone."

Mr. Melvin testified that he got lumber to the value of $267 from the plaintiff, the Hight Lumber Company, and that he went to see Mr. Rogers in September, to figure on the buildings; "And I told Mr. Rogers that I would get some lumber out there from Mr. Wright and some from him. And the bill I gave to Mr. Rogers, and he figured on it, and I took another bill to Mr. Wright and he figured on that. They both knew that I was getting lumber from both of them to put in these houses. They both knew it." He stated that the reason that he bought the lumber from Mr. Wright, the Hight Lumber Company manager, was that he could get it cheaper than from Mr. Rogers, and the latter knew he was buying it. Mr. Rogers furnished lumber on two houses; and when the witness was ready to build the third house Mr. Rogers told him to go to Mr. Wright and get the lumber. Witness said: "Mr. Rogers only furnished a thousand feet of flooring on the last house, and furnished the windows, doors, brick, lime, cement and roofing. On that third house Mr. Rogers didn't furnish any lumber at all but the flooring." He said that some of the Hight Lumber Company lumber went into all three of the houses. He testified as to the conversation with Mr. Rogers, that just before the third house was finished he told Mr. Rogers he was going to apply for a loan to cover cost of material in the houses, and what he owed to Mr. Rogers and Mr. Wright. He went to Jackson, and the loan was O.K.'d by the government and the bank, and they agreed to make the loan; but when the inspectors found no bathrooms in the houses built for negro tenants, the loan was turned down, that being a government requirement; otherwise the loan would have gone through, having been O.Kl.'d by the bank in Jack-

son. The witness stated that Mr. Rogers was thoroughly aware of the fact that. he bought lumber from Mr. Wright, plaintiff's agent, and sent an agent up there to get it; that Mr. Rogers told witness to get it, because the cost ran so high that he did not feel like furnishing lumber for the third house. The witness further denied that he had been running a sawmill, and said he had not done so for ten years.

The witness further testified that when they got through building these three houses the carpenter, Mr. Cawthen, cut the frame work for three porches on the back of the houses; and that this lumber was moved away from these houses, and used on another house that Mr. Cawthen had under construction.

Witness was asked the question, "Do you mean to tell the jury that Mr. Rogers agreed to buy the lot for you, to turn this property over to you, and to pay your labor bills, and still with the distinct understanding that Mr. Wright was to have a lien on that stuff ahead of him? A. He understood it. I don't know whether it was ahead, but he understood that he also was to furnish material out there." . . .

"Q. Tell the jury why Mr. Rogers consented for you to get that lumber there. A. From Mr. Wright?

"Q. Yes. A. He told me that it was running more than he expected it to run, and for me to go to Mr. Wright and get it. Mr. Rogers didn't let me have the lumber for the third house. That was Wright's lumber."

Mr. Rogers was introduced in his own behalf, and on behalf of respondent.

"Q. What is the document you have in your hand? A. It is an estimate on a certain. amount of building material, including 4,200 feet of lumber.

"Q. Who was that prepared by? A. By Mr. Miller, our sales manager.

"Q. For whom? A. Mr. Henry Melvin.

"Q. For what job? A. On three negro houses on Cowan street, I think it is.

"Q. On the same job involved in this law suit? A. Yes, sir; that is right. The lot that was bought from Mr. Mansell.

"Q. Do you know how much was delivered there? A. Of my own personal knowledge, I wouldn't say how many pieces. But I will make an affidavit to the fact that this material was all delivered on the job, my company will, and I will sign it."

Objection to this testimony, that it was neither relevant nor competent.

"By the Court: I think so, too, if the point is made on it. If I understand Mr. Rogers, he said he would make an affidavit that . . . someone—that your bookkeeper told you—

"By the witness: No sir. I said we will make an affidavit that this was all delivered there. There isn't any doubt to my mind there.

"By the Court: The question is, do you state now that it was delivered there?

"By the witness: Yes sir, I do.

"By Mr. Greaves: Now, how do you know that?

"By the Court: Well, that will be subject to cross-examination. I will have to let him state that.

"Q. Did you see it delivered? How do you know it? A. I probably didn't see it personally there, but I know from the records—

"Q. You just know from the way you do business, and that you are clear and honest and straight, and that you would not have a bill unless it was delivered A. Well—

"Q. You never saw it delivered? A. No, sir.

"Q. You couldn't swear, of your own knowledge, that it was put on the ground? A. I think I can show a delivery ticket. I think we have a signed delivery ticket on that, on everything there. . . .

"By Mr. Spivey: If counsel objects to the testimony

going in I will ask the Court to indulge us a few minutes while Mr. Rogers telephones down to have the delivery tickets brought up here.

"By the Court: All right.

"By the witness: It will take some little time.

"By Mr. Greaves: I still want him to make proof of it, if he brings them up here."

Thereupon, court was recessed while Mr. J. W. Rogers went after the delivery tickets.

"By Mr. Spivey: We rest.

"By Mr. Greaves: What are you going to do with your tickets?

"By Mr. Spivey: We haven't got them yet. We rest.

"My Mr. Greaves: Do you rest?

"By Mr. Spivey: Yes."

The defendants thereupon rested their case, and the plaintiff offered evidence in rebuttal, of Mr. Wright, manager of the Hight Lumber Company, who testified as to furnishing lumber as follows:

"Q. Did you ever have any conversation with Mr. Rogers in regard to lumber being furnished? A. I did.

"Q. What agreement did you have with him? A. Well I had no special agreement with him, except this: Mr. Melvin came to me several times to talk about getting lumber for building those cabins on Walnut street, and I—he gave me a list of the amount of material that he wanted for one cabin, and he said that he wanted three of the same—enough lumber for three of the same kind. And I said, 'Well, all right.' I took the order down, and then I said, 'Shall I consider this an order?' He said, 'Well, you hold that.' That was some time before this lumber was delivered. So he said that he was on a deal to put up those buildings, a deal with Mr. Rogers.

"By Mr. Spivey: May it please the Court, we object to going into this conversation with Mr. Melvin now.

"By the Court: Yes, I think the conversation with Mr. Melvin would have to be eliminated, sir.

"By Mr. Greaves: Mr. Melvin was the same one that owned the property and was building the houses.

"By Mr. Spivey: There is no defense made whatever by Melvin. There was no plea filed, and to that extent he is no party in this case. A default judgment could be taken against him, as far as that is concerned.

"By the Court: The only question is between the Rogers Lumber Company and the plaintiff. That is the only issue, between the plaintiff and Mr. Rogers.

"By Mr. Greaves: We take a judgment by default against Mr. Melvin as to the value of the lumber.

"By the Court: Yes, I think you are entitled to it.

. . .

"By Mr. Greaves: You heard Mr. Melvin's testimony here? A. Yes, sir; I did.

"Q. When was that first lumber bought? A. The first lumber was bought just a few days before—about the 5th or 6th of October, and I delivered the first bill on the 7th . . . that is for the first cabin, and I did not deliver any more until they were ready for it. And I was a little bit dilatory about rushing that lumber down, and Mr. Rogers called me up several times and wanted to know if I was going to get that lumber down and I told him yes. And I did. I delivered the full amount for the three cabins, according to the bill of lumber that Mr. Melvin bought for the cabins.

"Q. State whether or not you ever had any agreement with Mr. Melvin to have it paid for out of logs or anything? A. No, sir. There was nothing said about logs at all. He told me that he would—that that lumber would be paid for out of a loan that he was figuring on.

"Q. A loan from— A. On those three buildings, in connection with Mr. Rogers. That was the conversation.

. . .

"Q. Just what conversation did you have with Mr. Rogers, now, the first time he called you up? A. He wanted to know if I had a deal with Mr. Melvin to furnish lumber for those cabins, and I said yes.

"Q. What else was said? A. Well, there was several different things said. What do you mean?

"Q. Tell the jury now just as best you can what the entire conversation was that took place between you and Mr. Rogers at that time? A. Mr. Rogers wanted to know if I was going to take up a mortgage on that property, and I told him no, because I figured we had a materialman's lien on it.

"Q. You told Mr. Rogers you figured you had a materialman's lien on it? A. Yes, sir.

"Q. What did he say with reference to that? A. He said he was putting up money for the building of those cabins, and that he had put up the money for the lots."

He further testified that Mr. Rogers did not state that he had a mortgage until the foreclosure was started.

At the conclusion of the evidence the court gave an instruction to the jury to find for the plaintiff against J. H. Melvin for $267.33, and that the plaintiff was entitled to a lien on the property to that amount, which, however, is subject and inferior to the lien of the deed of trust of the defendant, the J. W. Rogers Lumber Company, for $1,224.77, and judgment was rendered in accordance with this instruction, from which judgment this appeal is prosecuted.

It will be seen from the above statement that there is conflict in the evidence as to the understanding between the plaintiff and the J. W. Rogers Lumber Company, and as to what took place between Melvin and the J. W. Rogers Lumber Company, and the conversation between J. W. Rogers, manager of the J. W. Rogers Lumber Company, and Mr. Wright, manager of the Hight Lumber Company, plaintiff in the lower court. It appears that J. W. Rogers Lumber Company originally contracted to put up the buildings, furnish the material, and pay the contractor. The question in dispute, as to whether J. W. Rogers, manager of the J. W. Rogers Lumber Company, requested Melvin, the owner, to buy the material from

the plaintiff, was an issue to be decided by the jury on the conflicting evidence. It also appears that J. W. Rogers, while stating that he would make affidavit to the delivery of the material to the amount of his claim, had no personal knowledge thereof; and when plaintiff insisted that he produce his tickets showing the amount, he first agreed to do so and took time to get them, and thereafter closed the case without producing them, or any other testimony by any witness having personal knowledge of the delivery of the materials, or of the amount, prices, etc. Under this state of the case it was error to give the instruction to find for J. W. Rogers Lumber Company for the amount given in the deed of trust, with interest. It was necessary for the defendant, J. W. Rogers Lumber Company, to establish the amount of its claim, to show the amount of material, etc., furnished by it under its contract. In our opinion, this evidence is required in a case of this kind, under the evidence for the respective parties in the case. The amount of plaintiff's claim was admitted, but the question of priority would be determined on the facts of this case, under appropriate instructions, by the jury.

The judgment is reversed, and the cause remanded.

Reversed and remanded.